ROBERT E. CLEVELAND, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cleveland v. Commissioner
Docket Nos. 1628-78, 1734-78, 1958-78.
United States Tax Court
T.C. Memo 1983-299; 1983 Tax Ct. Memo LEXIS 484; 46 T.C.M. (CCH) 257; T.C.M. (RIA) 83299; May 26, 1983. Phillip S. Makin, for the petitioner. Judy Jacobs, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent, using the net worth plus expenditures *487 method of recomputing income, determined deficiencies in petitioner's Federal income taxes and additions to tax under section 6653(b) [1] as follows: ADDITIONS TO
TAX UNDER
YEARS
TAX [2]
SECTION 6653(b)
1961
$1,253
$627
1964
5,854
2,927
1965
895
584
1966
3,527
1,763
Respondent has now conceded that no deficiency, or addition to tax under section 6653(b), is due from petitioner for calendar year 1961. After other concessions made by the parties, [3] the issues for decision are: (1) Whether, and to what extent, petitioner failed to report taxable income on his 1964, 1965 and 1966 income tax returns; (2) whether any part of petitioner's underpayment of tax for calendar years 1964, 1965 and 1966 is due to fraud; (3) whether the assessment of deficiencies for 1964, *488 1965 and 1966 is barred by the statute of limitations; (4) whether petitioner is entitled to dependency exemption deductions in 1964 for Kim and Christopher Vandersteen; [4]
(5) whether pietitioner's claimed loss of $8,004.95 on his 1964 return from alleged commodity trading during calendar year 1961 is a short-term capital loss or an ordinary loss; (6) whether petitioner is entitled to use the first in-first out ("FIFO") method of calculating his losses attributable to the purchase and sale of certain stock; and (7) what, if any, effect petitioner's judgment of divorce in 1966 had on petitioner's income during calendar years 1965 and 1966. FINDINGS OF FACT Some of the facts and exhibits have been stipulated and are incorporated herein by this reference. *489 Robert E. Cleveland (hereinafter "petitioner") filed his 1964, 1965 and 1966 income tax returns on April 15, 1965, April 14, 1966, and April 15, 1967, respectively. Petitioner reported $979.25 of gross income and no taxable income on his 1964 tax return. On his 1965 and 1966 tax returns, petitioner reported gross income of $5,520.74 and $5,107.12, respectively. For these same tax years, petitioner reported $102.10 of taxable income in 1965 and $1,591.04 of taxable income in 1966. Respondent's notices of deficiency herein were issued on November 28, 1977. At the time that he filed his petitions with this Court, petitioner resided in Northbrook, Illinois. In 1950, petitioner married his first wife, Dorothy. In 1952, they had a daughter named Carolyn. In 1962, petitioner divorced his first wife, and married Bernice Vandersteen. During their marriage, Bernice was not employed and did not receive any substantial gifts, inheritance or money from any source other than petitioner. At the end of 1963, petitioner purchased a house on Berglund Place in Northbrook, Illinois. Until August, 1965, he resided in this house with Bernice and his daughter. Sometime during 1964, Bernice *490 purchased $2,806.97 worth of furnishings from the Longworth Creative Interiors and Designers. From July of 1964 until July of 1965, Bernice's son from a former marriage, Robert Vandersteen, and his two children, Kim and Christopher, resided with petitioner. In his 1964 return, petitioner claimed dependency exemptions under section 151(e) for Kim and Christopher which respondent disallowed on the grounds that petitioner had failed to show that he had provided more than half of their support in 1964. From January, 1964, until August of 1965, petitioner spent approximately $50 per week on food. In July, 1965, petitioner separated from Bernice. At the time Bernice left the family domicile, she took with her a mink coat and a Pontiac automobile. On August 9, 1965, Bernice withdrew $8,116.99 from the Glencoe National Bank, thus closing an account which Bernice had opened earlier in the same year, using petitioner's funds. These three items together were worth $13,554.99. The record herein does not disclose that any property settlement was entered into between petitioner and Bernice. The record does not show, and petitioner does not contend that those items were ever returned to *491 nim. In August, 1965, petitioner and his daughter moved into petitioner's mother's house in Winnekta, Illinois. There, petitioner resided until the end of 1966. During this period petitioner spient $30 per week for food. In the years 1964 through 1966, petitioner, a practicing attorney in Chicago, Illinois, derived income from fees for legal services, and income from this source was reported in his returns. Petitioner also owned an apartment building on Dover Avenue in Chicago, and during the year 1964, he purchased another property on Foster Avenue in Chicago, at a cost of $55,000. He derived rental income from these properties, and he reported net losses from this source in each year. During each of said years, petitioner derived income from interest. No income from this source was reported in his returns. For the years 1965 and 1966, petitioner had income from dividends. Income from this source was reported for the year 1966 only. Between January and May, 1961, petitioner traded in commodity futures for his own account, as an investor, through E. F. Hutton and Company. For the year 1961, he had a net short-term capital gain from this activity of $571.50. On *492 February 28, 1961, at a cost of $6,500, petitioner became a member of the Chicago Board of Trade. Petitioner traded commodities, using this membership, solely for his own account as in investor. I. Usiskin and Company, Inc., a brokerage house (hereinafter "Usiskin"), maintained a margin account for petitioner and cleared petitioner's trades for him. On June 7, 1961, Usiskin sold petitioner's commodities contracts and closed his account. The selling of petitioner's commodities futures contracts resulted in a $57,347.60 short-term capital loss, which was paid by Usiskin and charged to petitioner's account. On July 5, 1961, petitioner sold his seat on the Chicago Board of Trade for $6,088, for a short-term capital loss of $412. As the result of the above transactions, and taking into account other short-term capital gains of $572.79 and long-term capital gains of $557.14 (not in controversy herein), petitioner had a net capital loss, all short-term, for the year 1961 of $56,058.37. Petitioner failed to repay Usiskin for the $57,300 that it had paid the Chicago Board of Trade Clearing Corporation on petitioner's behalf, and still was indebted for this amount, plus $47.60 of commissions, *493 at December 31, 1963. In 1961, Howard Fisher, as assignee of Usiskin, sued petitioner for failing to reimburse the company for the losses (as found above) incurred by petitioner while trading soybean futures, the money to cover such losses having been advanced by Usiskin. The above suit between petitioner and Howard Fisher was settled in 1964 for $8,004.95, which petitioner paid. In 1962, petitioner bought 200 shares of Brunswick stock through the offices of E.F. Hutton and Co. On September 9, 1963, petitioner acquired an additional 200 shares of Brunswick stock through Hayden, Stone and Company. Petitioner never took possession of these stock certificates, since his accounts at both E.F. Hutton and Co., and Hayden, Stone and Company were on margin. At petitioner's request, Hayden, Stone and Company sold the 200 shares of Brunswick stock in his account, on June 19, 1964. Petitioner's cost basis in this stock was $2,513.76, and his net sales proceeds were $1,767.24. For the years 1961 through 1966, petitioner had capital gains and losses as follows: Short-term
Long-term
Gains (Losses)
Gains (Losses)
1961
($56,615.51)
$557.14 1962
2,016.58 1963
0.60 1964
(1,299.95)
1965
714.43 0.82 1966
1.12 *494 For the years 1961, 1962 and 1963, petitioner reported no capital gains and losses in his income tax returns. His reported taxable income, computed without regard to any deductions for personal exemptions, was as follows: 1961
$4,355.83
1962
1,605.26
1963
371.53
During calendar year 1964, petitioner was an insurance broker with the New England Mutual Life Insurance Company. In 1964, petitioner paid this insurance company $1,155.80 in premiums for a policy that he held on his own life. Sometime during this same year, petitioner received a $635.69 check from New England Mutual. In May of 1966, John Carey, a special agent of the Internal Revenue Service, started an investigation into petitioner's income tax liabilities for calendar years 1960 through 1966.This investigation revealed that most of petitioner's business records relating to his practice of law consisted of checkbook stubs. From notations on these stubs, petitioner calculated the portion of his bank deposits that were taxable income to him. During a conference held in calendar year 1967, Special Agent Carey asked petitioner if he could examine these checkbook stubs. Petitioner stated that *495 he did not have these records, but that they were in the possession of his ex-wife Bernice. At several later conferences, during 1969 and 1970, petitioner had in his possession his original checkbook stubs for calendar years 1963 through 1966. Special Agent Carey again requested to see these records, and petitioner refused. Petitioner either did not have, or failed to produce (either for respondent's examination or at trial herein), adequate books and records with respect to his various income-producing activities, from which his correct income could be determined. Respondent accordingly recomputed petitioner's income on the net-worth-plus-expenditures method.
During all or some of the years in issue, petitioner maintained numerous bank accounts, including two in fictitious names -- the "A. Rocco" account at American National Bank, and the "Thomas Carlson" account at the Exchange Bank. During respondent's investigation, petitioner was asked whether he had any aliases that he used when making financial transactions. On two separate occasions, petitioner failed to reveal the existence of the "Thomas Carlson" bank account. During a 1967 interview with Special Agent Carey, *496 petitioner was asked how he could live on the small amounts of income reported on his 1962, 1963 and 1964 Federal income tax returns. Petitioner explained that he had managed during these years by residing with his mother for a substantial part of this period. As shown by our findings of fact herein, supra, this statement was untrue, and was contradicted by petitioner himself in testimony at trial. On the basis of respondent's investigation, petitioner was indicted on March 7, 1971, on a charge of willfully attempting to defeat and evade income tax for calendar year 1966, in violation of 26 U.S.C. section 7201, through filing a false and fraudulent income tax return. Petitioner was brought to trial on this charge in the United States District Court for the Northern District of Illinois, and on February 23, 1976, pleaded guilty to this indictment. On March 15, 1976, the United States District Court for the Northern District of Illinois entered judgment against petitioner. This judgment is now final. The following assets, liabilities, expenditures and other adjustments consistent with the net-worth method of determining income have been established *497 in this record by respondent, either by affirmative proof, stipulation of the parties, or concession by the adversely affected party, which show that for each of the years in issue, petitioner had taxable income in excess of that which was reported by him, and an underpayment of tax for each year: ROBERT E. CLEVELAND TENTATIVE NET-WORTH ANALYSIS ASSETS
12-31-63
12-31-64
12-31-65
12-31-66
Cash on Hand
$ 1,000.00
$ 1,000.00
$ 1,000.00
$ 1,000.00 Cash in Banks
Central National Bk.
475.27
Bernice Cleveland
Check. Acct.
#1,77741
Central National Bk.
414.48
Robert or Bernice
Cleveland
Check. Acct. #3-60228
American National Bk.
853.15
A. Rocco
Check. Acct. #770795
American National Bk.
204.02
Robert Cleveland
Savings Acct. #138625
Exchange National Bk.
1,781.59
1,651.60
(583.16)
Robert Cleveland
Check. Acct. #721837
Exchange National Bk.
97.67
107.26
2.60
( 99.43)
Thomas Carlson
c/o Robert Cleveland
Check. Acct. #174490
Northbrook Trust &
Sav. Bk.
138.54
Robert & Bernice
Cleveland
Check. Acct. #106-624-2
Cash in Savings &
Loan Assocs.
First Fed. Sav. & Loan
267.08
Bernice Vandersteen
Trust
for Robert Cleveland
Acct. #V-360468
First Fed. Sav. & Loan
3,864.85
B.V. Cleveland Trust
for Robert Vandersteen
Acct. #C-387154
First Fed. Sav. & Loan
51.60
54.01 Robert Cleveland
Acct. #C-417556
Home Fed. Sav. & Loan
318.08
Bernice Vandersteen
Trust
for Robert Cleveland
Acct. #285-576-5
Uptown Fed. Sav. & Loan
365.74
381.44
Bernice Vandersteen &
Robert Cleveland
Acct. #86049-4
North Fed. Sav. & Loan
559.35
584.80
Bernice Cleveland Trust
for Robert Vandersteen
Acct. #99133
Liberty Fed. Sav. & Loan
1,500.00
1,566.32
Bernice Cleveland
Acct. #35231
Liberty Fed. Sav. & Loan
3,063.75
Bernice Cleveland
Acct. #37348
Accounts Receivable
The Board of Trade
6,088.00
Harris Trust Sav. Bk.
115.34
Exchange Nat. Bk.
1,801.61
Helen Stuart
2,000.00
2,000.00
Reuben Webster
3,300.00
Jerome Levatino
1,000.00 No. Ill. Gas Co.
49.50
49.50
49.50
49.50 Television Elec. Fund
16.22
16.22
16.22
16.22 Eastern Canada Oil Co.
1,802.22
1,802.22
1,802.22
1,802.22 Corpus Christi Corp.
1,586.34
1,586.34
1,586.34
1,586.34 Brunswick Corp.
17,842.89
22,978.38
22,978.38
25,682.90 Colorado Fuel & Iron
7,718.02
Schick Electric, Inc.
3,570.00
Chrysler Corp.
4,830.44
18,377.57 Real Estate
4750 Dover, Chicago
36,450.00
36,450.00
36,450.00
36,450.00 a.Unamortized Mtg. Costs
140.17
130.51 b. Reserve for Repairs
1,800.00
1348 Foster, Chicago
55,000.00
55,000.00
55,000.00 a. Unamortized Mtg. Costs
92.23
87.48
82.73?1
b. Escrow for Taxes
2,040.00
1,104.86
1,423.94 621 Berglund, Northbrook
23,566.75
23,566.75
23,566.75
23,566.75 a. Escrow for Taxes
520.00
472.44
397.22
484.14 Investments
Packette Black Gold
2,525.00
2,525.00
2,525.00
2,525.00 Oil Corp.
Janco Corp.
3,200.00
3,200.00
3,200.00
3,200.00 Hawthorne Investments
3,447.70
3,447.70
3,447.70
3,447.70 Automobiles
Pontiac - 1963
3,238.00
3,238.00
Chevrolet - 1965
2,100.00
2,100.00
2,100.00 Cadillac - 1964
3,400.00
3,400.00 Office Furniture
1,929.62
1,929.62
1,929.62
1,929.62 Personal
Household Furniture
2,806.97
2,806.97
2,806.97 Carpeting
1,050.36
1,050.36
1,050.36 Furs
2,200.00
2,200.00
Jewelry
1,125.00 TOTAL ASSETS
$128,637.61
$181,220.70
$173,179.05
$187,608.89 LIABILITIES
Accounts Payable
E.F. Hutton & Co.
6,448.35
2,035.52
2,169.69
1,414.73 stock acct. #16473
E.F. Hutton & Co.
2,333.59
1,957.13
2,086.12
1,731.92 stock acct. #16467
Shearson, Hammill & Co.
1,982.28 Francis I. duPont & Co.
1,070.00
stock acct. #1493
Francis I. duPont & Co.
2,236.33
2,376.62
2,549.96 stock acct. #1490
Hayden, Stone & Co.
2,284.61
2.75
2.75
New England MutualLife
Ins.
a. policy #2833869
338.75
1,216.38
2,067.43 b. policy #2019070
706.52
1,533.83
1,690.48
1,690.48 New York Life Ins. Co.
122.00
972.52
972.52
972.52 United of Omaha
815.98
1,148.20
1,148.20
1,148.20 Exchange National Bank
a. loan #6519854
3,020.26
1,601.26 b. loan #6514293
c. loan #124-5620
d. loan #124-5513
2,200.00 e. loan #2820880
f. loan #2823625
General Motors
2,236.11
1,469.43
702.75 Continental Bank
a. loan #403241
2,553.66
1,418.70
756.64
852.56 b. loan #56021
Hattie Cleveland
1,500.00
1,000.00
1,000.00 Robert Davies
1,300.00
300.00
300.00 Phillip Makin
1,000.00 Gazzola Loan
2,425.00 American National Bank
4,500.00 LaSalle National Bank
21,917.73
20,188.50
N. Amer. Union Life
Assur.
17,688.54
15,069.40 Liberty Fed. Sav. & Loan
a. loan acct. #L7556
21,000.00
19,441.67
19,024.66
19,121.13 b. loan acct. #AOL-43
44,875.31
45,009.22
43,477.27 Real Estate Taxes
621 Berglund, Northbrook
470.56
1348 Foster, Chicago
940.59
Reserve for Depreciation
Office Furniture & Equip.
1,879.62
1,879.62
1,879.62
1,879.62 4750 Dover, Chicago
10,421.00
11,944.00
13,467.00
14,990.00 1348 Foster, Chicago
1,250.00
3,750.00
6,250.00 Automobiles - Business
500.00
1,000.00
1,500.00 TOTAL LIABILITIES
$72,453.62
$117,269.53
$120,028.13
$130,426.51 *498 EXPENDITURES
1963
1964
1965
1966
Insurance Premiums
New England MutualLife Ins.
a. policy #2833869
1,155.80
1,091.80
1,072.60
b. policy #2019070
237.80
161.20
237.80
New York Life Ins. Co.
244.00
244.00
244.00
United of Omaha
100.00
100.00
100.00
Prudential Ins. Co. of Amer.
76.15
76.15
Travelers Insurance
214.71
1,003.67
762.06
Equitable Life Assur, Soc.
316.20
Transcontinental Ins. Co.
556.40
278.20
278.20
London Guarantee & Accident Co.
299.00
816.00
Hone Insurance Co.
155.00
Interest
New England MutualLife Ins.
a. policy #2833869
16.94
60.82
b. policy #2019070
69.87
84.52
New York Life. Ins.
5.58
44.50
48.63
Mutual of Omaha
57.41
57.41
Continental Bank
a. loan acct. #403241
135.00
78.75
b. loan acct. #56021
General Motors
16.66
99.96
99.96
American National Bank
78.75
Liberty Fed. Sav. & Loan
a. Commission & Service charge
1,041.67
1,048.99
1,065.47
Internal Revenue Service
12.65
Exchange National Bk.
a. loan #6519854
93.48
171.38
b. loan #6514293
c. loan #124 5620
d. loan #124 5513
38.50
e. loan #2820880
f. loan #2823625
Francis I. duPont
a. acct. #1490
87.08
140.29
173.34
b.acct. #1493
34.59
Shearson, Hammill & Co.
5.27
111.98
Hayden, Stone & Co.
72.93
E.F. Hutton & Co.
a.acct. #16475
b. acct. #16473
297.15
134.17
145.04
c. acct. #16467
128.38
128.99
145.80
Other Expenditures
Food
2,600.00
2,160.00
1,560.00
Utilities
a. Northern III. Gas
82.20
229.17
5.89
b. Public Service Co.
40.52
79.91
Federal Income Tax Payments
484.80
315.60
Medical Expense
475.00
1,376.63
78.50
Drug Expense
100.50
Safe Deposit Box Rental
a. Glencoe National Bank
6.00
b. Northern Trust Co.
9.90
9.90
9.90
c.American National Bk
Charge Accounts
a. Sears, Roebuck & Co.
416.01
863.62
b. Crib Diaper Service
26.40
66.00
c. Betty's of Winnetka
178.66
127.90
d. Baskins
329.58
216.01
142.22
e. Marshall Field & Co.
393.92
30.00
f. Pollyanna
86.42
Contributions
150.00
100.00
200.00
Legal Expense
a. Oil litigation
b. Income Tax Prep.
100.00
c. Legal
800.00
Taxes
a. Real Estate
17.00
475.22
513.08
b. State & Local
200.00
120.00
100.00
c. Gasoline
75.00
50.00
25.00
d. Misc.
Child Support
640.00
440.00
TOTAL EXPENDITURES
$10,475.72
$13,298.64
$8,584.75
*499 RECAPITULATION
1963
1964
1965
1966
Total Assets
128,637.61 181,220.70 173,179.05 187,608.89 Total Liabilities
(72,453.62)
(117,269.53)
(120,028.13)
(130,426.51)
Balance - Net Worth
56,183.99 63,951.17 53,150.92 57,182.38 Prior Year's Net Worth
(56,183.99)
(63,951.17)
(53,150.92)
Increase in Net Worth
7,767.18 (10,800.25)
4,031.46 ADJUSTMENTS: Expenditures
10,475.72 13,298.64 8,584.75 R/E Taxes - 1348 Foster
(1,483.46)
1,483.46 Nondeductible capital
loss
299.95 Capital loss carryover
(299.95)
Property relinquished
to Bernice
13,554.99 Dividend exclusion
( 62.50)
(100.00)
Gifts Received
( 10.00)
( 20.00)
( 20.00)
Nontaxable income
(2,543.70)
( 1,278.70)
(1,427.95)
Capital gains deduction
( 0.56)
Corrected Adjusted
Gross Income
14,505.69 15,875.69 11,067.70 Itemized Deductions
(3,253.54)
(4,777.26)
(3,129.58)
Exemptions per return
(3,000.00)
(1,200.00)
(1,200.00)
Corrected Taxable
Income
8,252.15 9,898.43 6,738.12 Less: Taxable Income
Reported
( 102.10)
(1,591.04)
Unreported Taxable
Income (Tentative)
$8,252.15 $9,796,33 $5,147.08 *500 In addition to the above items, which we find to be established by the record herein, respondent's recomputation, upon which his statutory notices herein was based, made two other adjustments: a) Respondent determined that the payment of $8,004.95 by petitioner in 1964 in settlement of the suit against him to recover the advances made to him by Usiskin on petitioner's margin account should be treated as a short-term capital loss in that year. Having determined that petitioner had a net capital loss (long-term) for that year of $1,299.95 before considering this item, respondent added back the full $8,004.95 to petitioner's income in 1964, but allowed it as a capital loss carryover into the years 1965 and 1966, to the extent of any net capital gains in those years, under section 1212, plus $1,000 per year as a deduction from ordinary income, under section 1211. Respondent did not determine that petitioner was indebted to Howard Fisher, as assignee of Usiskin at December 31, 1963, in the amount of $57,347.60, which debt was discharged by the payment of $8,004.95 in 1964. [5]
b) Respondent determined that petitioner was *501 not entitled to claim Kim and Christopher Vandersteen as exemptions for the year 1964, on the ground that petitioner had failed to establish that he furnished more than half their support in said year. Respondent thus reduced petitioner's allowable exemption to $1,800 from a claimed $3,000. [6]
We find that the net worth analysis shown above herein should be modified to give effect to the above two items as follows: ADJUSTMENTS TO TENTATIVE NET WORTH ANALYSIS 1963
1964
1965
1966
Total assets (as above)
$128,637.61 $181,220.70 $173,179.05 $187,608.89 Total Liabilities (as
above)
(72,453.62)
(117,269.53)
(120,028.13)
(130,426.51)
Add: Howard Fisher,
assignee of I. Usiskin & Co.
(commodity account)
(57,347.60)
Balance Net Worth
( 1,163.61)
63,951.17 53,150.92 57,182.38 Prior Years Net Worth
1,163.61 (63,951.17)
(53,150.92)
Increase in Net Worth
65,114.78 (10,800.25)
4,031.46 Adjustments: Expenditures
10,475.72 13,298.64 8,584.75 Add: Discharge of Fisher
debt
8,004.95 Nondeductible capital loss
1,299.95 Capital gains eliminated by
capital loss carryover
a. Short term
(714.43)
b. Long term
( 0.82)
( 1.12)
Capital loss carryover (short
term)
allowable against ordinary
income
(1,000.00)
(1,000.00)
(1,000.00)
Property relinquished to
Bernice
13,554.99 Dividend exclusion
( 62.50)
( 100.00)
Gifts received
( 10.00)
( 20.00)
( 20.00)
Non-taxable income
(2,543.70)
( 1,278.70)
(1,427.95)
Real Estate Taxes -
1348 Foster
(1,483.46)
1,483.46 Corrected Adjusted Gross
Income
79,858.24 14,460.39 10,067.14 Itemized deductions
(3,253.54)
( 4,777.26)
( 3,129.58)
Allowable exemptions
(1,800.00)
( 1,200.00)
( 1,200.00)
Corrected Taxable Income
74,804.70 8,483.13 5,737.56 Less: Taxable Income Reported
( 102.10)
( 1,591.04)
Unreported Taxable Income
74,804.70 8,381.03 4,146.52 *502 In his statutory notices of deficiency determining the deficiencies and additions to tax first above stated herein, respondent determined that petitioner had additional and unreported income for the years now before us as follows: 1964
$23,334.00
1965
4,891.00
1966
14,287.00
Based upon the above analysis, we find that petitioner's taxable income was understated in each of the years 1964 through 1966 in the following amounts: Amount of
Year
Underpayment
1964
$74,804.70
1965
8,381.03
1966
4,146.52
A portion of the underpayment of tax attributable to the foregoing understatements in each year was due to fraud. OPINION Respondent has used the net worth plus expenditures method of determining petitioner's taxable income. Under this method, a taxpayer's income is computed by determining the excess of his assets at cost, less his liabilities, at the beginning and the end of each tax year.The difference between these two figures represents the increase (or decrease) in the taxpayer's net worth. Such difference is then adjusted by adding nondeductible expenditures, such as living expenses, and by subtracting nontaxable sources of income, *503 such as gifts, inheritance, loans and the like. See Holland v. United States,348 U.S. 121 (1954); United States v. Giacalone,574 F.2d 328, 330-331 (6th Cir. 1978). Thus, an increase in a taxpayer's net worth, plus his nondeductible expenditures, less nontaxable receipts, is considered taxable income. Holland v. United States,supra.
If the taxpayer's bookkeeping is inadequate, or incomplete, the respondent may resort to the net worth method of computation. Section 446(b); Holland v. United States,supra;Merritt v. Commissioner,301 F.2d 484, 486 (5th Cir. 1962); Giddio v. Commissioner,54 T.C. 1530 (1970). As our findings of fact reveal, petitioner's business records were incomplete, and in some cases nonexistent. The respondent was therefore justified in resorting to the net worth plus expenditures method to determine petitioner's taxable income in each of the years now in issue.
Petitioner challenges respondent's net worth computation upon which the deficiencies herein are predicated, denies the commission of fraud, and asserts that the assessment of any deficiencies *504 is barred by the statute of limitations. Respondent asserts that his net worth computation establishes that there were underpayments of tax owed by the petitioner to the United States for 1964, 1965 and 1966. For calendar years 1964 and 1965, respondent relies on this net worth analysis and petitioner's conduct to establish fraud. Respondent further contends that petitioner is estopped from denying that he committed fraud in 1966, within the meaning of section 6653(b), since he was convicted criminally of filing a false and fraudulent return for that year. Respondent's statutory notices of deficiency were issued on November 28, 1977, over ten years after each of the returns for the years in issue were filed, and long after the normal three-year statute of limitations for determining deficiencies had expired. Section 6501(a). Respondent is therefore foreclosed from assessing any deficiencies or additions to tax, unless he can lift the bar of the statute by showing that petitioner committed fraud within the meaning of section 6653(b). [7] In order to establish this proposition, respondent must establish by clear and convincing evidence both that (1) there was some underpayment *505 of tax by petitioner for the year in question, and (2) that some part of such underpayment was due to fraud. Section 7454(a); Plunkett v. Commissioner,465 F.2d 299 (7th Cir. 1972), affg. a Memorandum Opinion of this Court; Rule 142(b). Respondent may establish the fact of an underpayment, as well as fraudulent intent, through his net worth computations, but he has the same burden of proof with respect thereto as with respect to any other evidence which he might offer. Lee v. United States,466 F.2d 11 (5th Cir. 1972). Only when and if respondent meets this initial burden will the bar of the statute of limitations be lifted, and only then will respondent's net worth analysis, upon which his determinations of additional income are based, enjoy its usual presumption of correctness, putting the burden of proof on petitioner to show error therein, as in the usual case. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). The addition to tax under section 6653(b), if found, will then apply to the entire deficiency ultimately determined, even though only a part thereof may be due to fraud. Section 6653(b); Stone v. Commissioner,56 T.C. 213 (1971). *506 An orderly disposition of the issues in this case thus requires us to address the fraud and related statute of limitations issues first, since, if respondent fails to carry his necessary burden of proof thereon, the remaining issues become moot, and decision must be entered for petitioner. Where, as here, in the case of the years 1964 and 1965, however, respondent's net worth analysis is relied on exclusively to establish unreported income (and necessary underpayments of tax resulting therefrom), there is inevitably some overlap between the two stages, see Lee v. United States,supra, at 16, and determinations made in the first stage may also enter into the second stage, where further adjustments *507 to income may be involved. I. FRAUD
STATUTE OF LIMITATIONS
A. Years 1964 and 1965.
We first address the years 1964 and 1965, where respondent relies upon his net worth analysis to establish that there was some underpayment of tax for each year, and relies on the same analysis, together with the surrounding circumstances and petitioner's conduct, to establish fraudulent intent. 1. Underpayment of Tax.
The finding of underpayment of tax, based upon additional unreported income pursuant to a net worth analysis, is basically a fact-finding process. We have found that each of the items reflected in the Tentative Net Worth Analysis in our findings of fact is supported in this record either by affirmative evidence, by stipulation of the parties, or by concession of the party adversely affected thereby.[8]
Petitioner alleges numerous errors in respondent's net worth computation, *508 which, if sustained, would result in no underpayment of tax for calendar years 1964, 1965 and 1966. Our findings of fact dispose of most of petitioner's objections. To the extent that any adjustments warrant further discussion, they are treated in Part II of this opinion, infra.
For calendar years 1964 and 1965, we hold that respondent has met his burden of establishing, by clear and convincing evidence, that petitioner underpaid his taxes for each of these two years, based upon the additional unreported income shown. In so doing, respondent has shown the likely sources of petitioner's taxable income, and has negatived nontaxable sources in excess of the amounts which we have found. See Holland v. United States,supra.The question now becomes whether any part of these underpayments during calendar years 1964 and 1965 was due to fraud. 2. Fraudulent Intent to Evade Taxes.
Respondent has the burden of proving, by clear and convincing evidence, that some part of the underpayment is due to fraud with the intent to evade tax. Section 7454(a); Rule 142(b); Stone v. Commissioner,supra;Otsuki v. Commissioner,53 T.C. 96, 105 (1969). *509 Respondent must show that the taxpayer intended to evade taxes which he knew or believed to be owing by conduct intended to conceal, mislead or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Webb v. Commissioner,394 F.2d 366, 377-378 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner,26 T.C. 107, 111-113 (1956). The existence of fraud is a question of fact that we must decide after a careful examination of all the evidence in the record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. 578 F.2d 1383 (8th Cir. 1978); Mensik v. Commissioner,328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962). We recognize that proof of petitioner's fraudulent intent is seldom established by direct evidence. Rather, fraudulent intent must in many instances be proved by the whole course of petitioner's conduct, and the inferences that can be properly drawn from such behavior. Otsuki v. Commissioner,supra; *510 Beaver v. Commissioner,55 T.C. 85, 93 (1970); Nicholas v. Commissioner,70 T.C. 1057, 1065 (1978). We find that the record clearly establishes that petitioner filed false and fraudulent tax returns with the intent to evade tax for tax years 1964 and 1965. Petitioner's conduct throughout the period in question was fraught with behavior that would support a determination of fraud. First, substantial understatements of income over several consecutive years are persuasive evidence of fraud. Otsuki v. Commissioner,supra;Merritt v. Commissioner,supra;Drieborg v. Commissioner,225 F.2d 216 (6th Cir. 1955). As established above, petitioner had substantial understatements of income, compared to the income reported, in each of the tax years now in issue. Cf. Vassallo v. Commissioner,23 T.C. 656 (1955). Other conduct by the petitioner also points to his fraudulent intent to evade taxes. At several conferences with respondent's representatives during 1969 and 1970, petitioner had in his possession his original checkbook stubs for calendar years 1963 through 1966. Special *511 Agent Carey asked if he could examine these checkbook stubs, and petitioner refused. As this Court has stated: "[f]raud is also shown by the taxpayer's evasive conduct in concealing material records from the respondent's agents during the investigation." [9]
Petitioner also maintained two bank accounts in fictitious names: the "A. Rocco" account at American National Bank, and the "Thomas Carlson" account at the Exchange Bank. Petitioner admitted that he maintained these accounts in order to prevent creditors from attaching these assets. During Special Agent Carey's investigation, petitioner was asked whether he had aliases that he used when making financial transactions. On two separate occasions, petitioner failed to reveal the existence of the "Thomas Carlson" bank account. Conduct to mislead or conceal assets is evidence of fraud. Spies v. United States,317 U.S. 492, 499 (1943). Inconsistencies in petitioner's testimony also shake his credibility with regard to explanations that he offered with respect to his ability to support himself and his family on the amount of income declared *512 on his 1964, 1965 and 1966 tax returns. In a 1967 interview with Special Agent Carey, petitioner was asked how he could live on the small amounts of income reported on his 1962, 1963 and 1964 tax returns. In response, petitioner stated that he had managed to exist on such small amounts of income by residing with his mother during a substantial part of this period. At trial, petitioner testified that until he moved in with his mother in July of 1965, he resided in Chicago, Illinois. The credibility of a witness' testimony is judged, among other things, on whether it is inconsistent with prior explanations offered by petitioner.See Archer v. Commissioner,227 F.2d 270, 273 (5th Cir. 1955), affg. a Memorandum Opinion of this Court. Inconsistencies such as this bear on the credibility and weight we can give to the explanations of numerous items of income, expenditures and liabilities that petitioner claims are inaccurately reflected in respondent's net worth schedule. Finally, in 1976, petitioner pleaded guilty to willfully attempting to defeat and evade income taxes for calendar year 1966. Although not controlling for the years 1964 and 1965, petitioner's conviction *513 of criminal tax fraud in 1966 can be considered as an indicium of fraud for other tax years in close proximity to the tax year for which the taxpayer has been convicted. See Vassallo v. Commissioner,23 T.C. 656, 663 (1955). Based on all of the above evidence, we find that respondent had fully established petitioner's fraudulent intent for each of the years in issue. It is highly unlikely that petitioner, a well-educated man and a practicing attorney-at-law, simply overlooked declaring substantial amounts of income during these years since, as an attorney, he knew of his obligation to accurately report his income. See Vise v. Commissioner,31 T.C. 220, 227 (1958), affd. 278 F.2d 642 (6th Cir. 1960). Knowing that he had such an obligation, petitioner kept incomplete records, used aliases when making financial transactions, and refused to cooperate with respondent's agent during the investigation. Considering petitioner's professional training and status, we are left only with one other plausible alternative: that petitioner intentionally sought to avoid a tax he knew or believed to be owing. Grosshandler v. Commissioner,75 T.C. 1 (1980); *514 Kostner v. Commissioner,T.C. Memo. 1983-109. B. Year 1966.
What we have said with regard to respondent having carried his burden of proof on the fraud issue for 1964 and 1965 is equally applicable to the year 1966. There is, however, another factor with respect to this year which supervenes and takes precedence over the proof of fraud offered herein through respondent's net worth analysis and petitioner's conduct. On February 23, 1976, petitioner pleaded guilty in a United States District Court to a criminal charge of willfully attempting to evade tax for calendar year 1966, by filing a false or fraudulent income tax return, in violation of 26 U.S.C. section 7201. Pursuant to petitioner's guilty plea, judgment was entered by the United States District Court, and this judgment has become final. Respondent contends that since he is a party in privity with the United States of America, and since the United States of America was the prosecuting party in this earlier criminal case, the previous adjudication of this issue is conclusive and binding on petitioner, and the doctrine of collateral estoppel applies.Thus, respondent claims *515 that petitioner is precluded from asserting that he did not intentionally file a false or fraudulent return for 1966. Petitioner diagrees, but the exact nature of his objection remains unclear. Respondent is correct. Fraud, within the meaning of section 6653(b), is conclusively established by collateral estoppel (estoppel by judgment), when the same taxpayer has, for the same tax year, been criminally convicted of filing a false or fraudulent income tax return under 26 U.S.C. 7201. Amos v. Commissioner,43 T.C. 50 (1964), affd. 360 F.2d 358 (1966); Arctic Ice Cream v. Commissioner,43 T.C. 68 (1964). A guilty plea to a charge of criminal tax evasion (as opposed to conviction after trial) does not alter the applicable rule of estoppel by judgment. Stone v. Commissioner,supra.In the present case, petitioner is therefore precluded from claiming that his 1966 return was not fraudulent within the meaning of section 6653(b). C. Statute of Limitations.
Fraud having been established for each of the years in issue, the statute of limitations is lifted, section 6501(c) (1), and the petitioner *516 has the burden of showing that respondent's determination of deficiencies were erroneous. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). II. ADJUSTMENTS TO INCOME.
As previously noted, we have deferred comment on various items of adjustment to income, which were in dispute between the parties and which we deem worthy of discussion, to this second stage of the opinion, after the issues of fraud and the statute of limitations have been disposed of. We now turn to this subject, with the following prefatory explanation: Our ultimate determinations as to petitioner's unreported income are as contained in the Tentative Net Worth Analysis, as modified by the Ajustments to Tentative Net Worth Analysis, both contained in our findings of fact herein. The reason for the separation was that there were two items of adjustment made by respondent which we excluded from the first calculation, which contains those items on which respondent fully met his burden in proving fraud. The first item so excluded, having to do with petitioner's commodities transactions, was omitted because we have concluded that both parties are wrong in their positions as to how this *517 item is to be treated. The second disputed item, having to do with claimed exemptions for Kim and Christopher Vandersteen, was excluded because respondent offered no proof on this item. Neither issue was considered in arriving at our findings on the fraud issue. Both items are discussed hereinafter under the year 1964, and are contained in our schedule of Adjustments to Tentative Net Worth Analysis, which contains our ultimate findings as to unreported income. A. Tax Year 1964.
1. Petitioner's Basis in Brunswick Stock.
Petitioner claims that respondent overstated the value of his Brunswick stock when he included this asset (at petitioner's cost) in his net worth statement at December 31, 1964. The crux of petitioner's argument rests on his assertion that the first in-first out ("FIFO") method of calculating gains and losses from the purchase and sale of stock is the appropriate methodology in computing losses that he may have suffered from the sale of 200 shares of this stock in 1964. Respondent disagrees, and states that the FIFO method is only to be used when it is impossible to adequately identify the stock sold. Respondent asserts that he has specifically *518 identified the 200 shares of Brunswick stock that petitioner sold in 1964. As discussed earlier in our findings of fact, the 200 shares of Brunswick stock sold by petitioner in 1964 were the same shares he had acquired in 1963 through Hayden, Stone and Company. Since the Brunswick stock sold can be adequately identified, it is inappropriate for the petitioner to utilize the FIFO method of calculating his loss from the sale of this stock. Section 1.1012-1(c), Income Tax Regs. Respondent's position is, therefore, sustained. [10]
2. Petitioner's Acquisition of Home Furnishings.
Petitioner complains that the net worth schedule should not include as assets home furnishings purchased by Mrs. Bernice Cleveland in 1964 from the Longworth Creative Interiors and Designers, at a cost of $2,807. Petitioner argues that he had no knowledge of this transaction, his ex-wife *519 Bernice had separate money, and the respondent did not establish that these furnishings were purchased with petitioner's earnings. He claims that the purchases were made by Bernice with her own funds. The record shows that during petitioner's marriage to Bernice, she was not employed and did not receive any substantial gifts or inheritance. What separate money Bernice may have had came from $1,600 which she received from an insurance company, and from the approximately $1,750 she received in a divorce settlement from a prior husband. At no time did petitioner claim that his ex-wife had private sources of income other than those specified above. The funds received by Bernice from her insurance claim and her divorce property settlement are included in respondent's net worth statement as nontaxable sources of income. With no other facts being offered by petitioner, this $2,807 spent by Bernice Cleveland in 1964 for home furnishings is properly included in respondent's net worth schedule as an asset. [11]
*520 3. New England Mutual Life Insurance Policy Premiums.
Petitioner claims that respondent erred by including $1,155.80 in his net worth schedule, as a nondeductible personal expenditure, for insurance premiums paid by petitioner to New England Mutual Life Insurance Company during 1964. Petitioner argues that he actually spent $520.11 on these insurance premiums in 1964, since $635.69 of the original $1,155.80 paid to New England Mutual Life Insurance Company was rebated to petitioner. Thus, petitioner contends that the $1,155.80 figure included on respondent's net worth schedule as an expenditure for 1964 should be reduced to $520.11. Respondent disagrees and argues that this "refund" of $635.69 was in fact a commission for petitioner's services as a broker, and not a nontaxable rebate. [12] As discussed previously, petitioner at this point has the burden of showing respondent's determination to be erroneous. Petitioner's own testimony was the only evidence submitted to establish that the $635.69 petitioner received from New England Life was a refund and not a commission for services rendered. Without further evidence submitted to substantiate his claim, we find that *521 petitioner has failed to carry his burden of proof on this issue. In that connection, we note that payment of such a "rebate" (which is the same as a discount) on the premium by the insurance company is specifically prohibited by law. Illinois Ins. Code, Section 151, Ill. Rev. Stat. Ch. 73, sec. 763. 4. Purchase Price of Foster Avenue Apartment Complex.
Petitioner has also placed in issue the cost of the Foster Avenue Apartment building that he purchased in 1964. It is his contention that he purchased this building for $54,243.75, rather than the $55,000 figure showsn as an asset on respondent's net worth schedule. A review of the record convinces us that the actual purchase price of the Foster Avenue Apartment Complex was $55,000. Petitioner made a downpayment of $2,000 cash at the time that he purchased *522 the Foster Avenue Apartment Complex.Petitioner acquired a first mortgage on the property of $48,000 and a second mortgage of $10,000 which he was able to buy at a $5,000 discount. The figure of $55,000 is supported by the record, and we see no reason to disturb respondent's determination. 5. Personal Loans.
Petitioner also complains that respondent improperly refused to include $3,449.69 as a nontaxable source of income in 1964 which he claims were repayments on loans that he had made to various clients. The only evidence submitted by petitioner to establish the existence of these loans was a schedule drawn up by Special Agent Carey from verbal statemens made by the petitioner at various conferences held in calendar years 1969 and 1970. We believe that petitioner's failure to submit other testimony or documentary evidence sufficient to establish the existence of these loans is fatal to his claim.
Petitioner claims that documentation that could establish the validity of these loans, along with other office records, was destroyed by his (third) ex-wife Frances sometime in 1979 or 1980.Even if we were to assume that this is true, this fact alone does not alter petitioner's *523 ultimate burden of showing respondent's determination to be erroneous. Petitioner could have subpoenaed some of his former clients, or supplied other office records to demonstrate his practice of making such client loans. We do not believe that petitioner's testimony is sufficient in and of itself to warrant a holding in his favor. We are not compelled to consider petitioner's testimony as conclusive evidence. See Archer v. Commissioner,227 F.2d 270, 273 (5th Cir. 1955), affg. a Memorandum Opinion of this Court. Without independent verification of these loans, we feel compelled to find for the respondent. 6. Travelers Insurance Premiums.
Respondent admits that the Travelers Insurance Premium expenditures for calendar years 1964 and 1965, as listed on his net worth schedule, are erroneous. Respondent concedes that these expenditures should be reduced by $280 in calendar year 1964 and $300 in calendar year 1965. Exhibit 64, submitted at trial, verifies that petitioner's mother reimbursed him for the amounts specified above. Our net worth schedule has been adjusted to reflect this concession. 7. Petitioner's Commodity Transactions.
a. *524 Losses.
During 1961, petitioner was a member of the Chicago Board of Trade, and traded commodities solely for his own account. Usiskin, a brokerage house, established a margin account and cleared petitioner's trades for him. By clearing these trades, Usiskin acted as a surety and guaranteed that petitioner would fulfill all of his obligations that arose as a result of his commodity dealings. For reasons not disclosed in this record, Usiskin sold all of petitioner's soybean futures and closed his commodity account on June 7, 1961. The selling of petitioner's soybean futures resulted in a $57,347.60 loss, including commissions, which was charged to petitioner's account at that time. Subsequently, petitioner failed to repay Usiskin $57,315. that Usiskin had paid the Chicago Board of Trade Clearing Corporation on petitioner's behalf. In late 1961, Howard Fisher, an assignee of Usiskin, sued petitioner to collect this sum, which he still owed on his account. [13] In 1964, this suit was settled for $8,004.95, which petitioner paid. On his 1964 return, petitioner took a $7,500 ordinary loss deduction, allegedly based on this transaction.
*525 Respondent contends that the soybean futures that petitioner traded through Usiskin were capital assets as defined by section 1221.He further contends that these losses were incurred during 1964 and were short-term capital losses. He accordingly computed a short-term capital loss on this basis. Citing Corn Products Refining Company v. Commissioner,350 U.S. 46 (1955), petitioner argues that his losses sustained while trading soybean futures were ordinary in character since he was a member of the Chicago Board of Trade during 1961, and as such, was engaged in the business of commodity trading. Petitioner reasons that since he was in the trade or business, the commodity futures that he bought and sold were not capital assets. Both parties have assumed for purposes of this case that the amount paid by petitioner to Howard Fisher in 1964, and deducted on petitioner's 1964 tax return, constitute losses from the sale or exchange of commodity futures during 1964. We believe that this assumption is incorrect and improperly characterizes the issue before us. In reality, two transactions are involved herein. First, petitioner accumulated some $57,000 worth of commodity *526 losses in 1961. These losses in themselves resulted in tax consequences. The settlement of the suit in 1964 was a separate transaction which stems not from the losses incurred by petitioner in 1961, but rather from petitioner's liability to Usiskin, which was called in as petitioner's surety to discharge the indebtedness which had resulted from petitioner's commodity losses. The transactions must be considered separately.
Between February and June, 1961, petitioner made approximately 80 commodity transactions on the Chicago Board of Trade. In each instance, these trades were cleared through Usiskin. On June 7, 1961, Usiskin closed out petitioner's commodity account. The selling of petitioner's soybean futures by Usiskin resulted in a $57,347.60 loss, which was charged to petitioner's account. On these facts, it is clear that petitioner's losses from commodities occurred in calendar year 1961, and should have been reported on petitioner's 1961 return. Mummert Lumber & Tie Co. v. Commissioner,16 B.T.A. 1188 (1929); Bauer v. Commissioner,2 B.T.A. 147 (1925); cf. Thiele v. Commissioner,32 B.T.A. 134 (1935). The fact that *527 petitioner incurred commodity losses in 1961 does not determine whether these losses were ordinary in character, or short-term capital losses. The crux of the original controversy between the parties (as they conceived it) is whether soybean futures contracts, in petitioner's hands, were capital assets as defined by section 1221. Section 1221 states in pertinent part: For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include -- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * * Unless petitioner was in the trade or business of commodity trading, the losses resulting from the buying and selling of soybean futures in 1961 are capital in nature, and petitioner is entitled to deduct these losses only to the extent allowed by sections 1211 and 1212. The proper test as to whether an individual is carrying on a trade or business requires *528 an examination of all the facts and circumstances involved in each case. Ditunno v. Commissioner,80 T.C. 362 (1983); Higgins v. Commissioner,312 U.S. 212 (1941); United States v. Pyne,313 U.S. 127 (1941). From all the facts and circumstances, we have found that petitioner was not in the trade or business of commodity trading.
The record indicates that, except for calendar year 1961, petitioner only traded commodities on an infrequent or sporadic basis. On February 28, 1961, petitioner became a member of the Chicago Board of Trade. During this year, he made approximately 80 commodity transactions. At first blush, these facts, standing alone, might tend to support petitioner's contention that in 1961 he was in the separate trade or business of commodity trading, [14] but other facts contradict this inference. During calendar year 1961, petitioner not only bought a seat on the Chicago Board of Trade; *529 he also sold it. In fact, petitioner bought and sold his seat on the exchange within a six-month period. Petitioner was involved in commodity trading during 1960 and 1961. On his tax returns for these years (which are in evidence), petitioner did not report any gains or losses resulting from commodity trading, either as capital transactions or as resulting from a trade or business.The $7,500 deduction claimed on his 1964 return was identified as the settlement of a claim against the petitioner, "d/b/a Commodities Broker," and was effectively claimed as an ordinary loss by showing it as a negative adjustment to petitioner's ordinary income from "other sources" on his 1964 return, although there is no evidence that petitioner engaged in any commodities transactions in any capacity after 1961. Finally, petitioner failed to keep separate books and records relating to the purchase and sale of commodities. Viewing these facts together, we can only conclude that petitioner engaged in commodity futures trading as a form of personal investment. Petitioner has the burden of proof to establish that he was in the trade or business of commodity trading. Rule 142(a); Hale v. Commissioner,T.C. Memo. 1982-527. *530 In light of the countervailing facts outlined above, we do not believe that petitioner has offered sufficient proof to establish his position. Accordingly, the losses petitioner incurred were capital in nature. Section 1221. Further, these losses were short-term capital losses as defined in section 1222. [15]
For the tax years here in issue, section 1211(b) allowed an individual taxpayer to deduct losses from the sale or exchange of capital assets only to the extent of the gains from such sales or exchanges, plus the taxable income of the taxpayer or $1,000, whichever was less. With respect to any capital losses in excess of the amount allowable, section 1212(b) permitted the individual taxpayer to carry such excess forward into subsequent years and claim deductions therefor to the extent permitted in each year by section 1211(b), until such carryovers were exhausted. Beginning with the year 1964, however, pursuant to amendments to section 1212 enacted by the 1964 Revenue Act, Pub. L. 88-272, sec. 230(a), 78 stat. 19, individual taxpayers were required to segregate their capital *531 loss carryovers into long-term and short-term, and apply them separately to long-term and short-term gains occurring in the carryover year, with the additional $1,000 deduction against ordinary income (as provided by section 1211(b)) being taken, first from the remaining short-term carryover, and second, from any remaining long-term carryover, to the extent thereof. Prior to 1964, capital loss carryovers were computed by netting all capital gains and losses, with any resulting unused net capital losses being treated as short-term carryovers into the succeeding five taxable years. In the instant case, the years before us are 1961, 1964, 1965 and 1966. [16] These are the only years for which we have jurisdiction to determine petitioner's tax liability, but we have jurisdiction to consider facts for other years which have an impact on petitioner's tax liability for the years before us. Section 6214(b); Phoenix Coal Co. Inc. v. Commissioner,231 F.2d 420 (2d Cir. 1956); Lone Manor Farms, Inc. v. Commissioner,61 T.C. 436 (1974), affd. in unpublished opinion (3d Cir. 1975). *532 Having found on this record that petitioner had a net capital loss (short-term) for 1961 of $56,058.37, we must determine how much of such loss was available to petitioner in 1962 and 1963, years which are not before us, in order to determine the amounts which may be available to him in 1964, 1965 and 1966, years which are before us. Whether or not petitioner claimed any amounts of capital loss carryover against his income in the intervening years is not relevant. An amount which would have been allowable, if claimed, is to be considered as actually allowed in determining the amount remaining to be carried over into subsequent years. Sections 1211, 1212; Reg. Secs. 1.1211-1(a), 1.1212-1(a); cf. Springfield Street Ry Co. v. United States,312 F.2d 754 (Ct. Cls. 1963); Lone Manor Farms, Inc. v. Commissioner,supra.[17] Application of these principles to the present facts results in the following amounts of capital loss carryovers being available to petitioner in the years before us, which are given effect in the schedule of Adjustments to Tentative Net Worth Analysis in our findings of fact, to the extent permitted by sections 1211 and 1212: *533 Capital Gains (Losses)
Long-Term (LT) or
Capital (Loss)
Year
Short-Term (ST)
Taxable Income *
Carryover
1961
$ (56,615.51) (ST)
$4,355.83
$ (55,058.37) (ST)
557.14 (LT)
1962
(ST)
1,605.26
(52,041.79) (ST)
2,016.58 (LT)
1963
(ST)
371.53
(51,669.66) (ST)
0.60 (LT)
1964
(ST)
76,304.75
(50,669.66) (ST)
(1,299.95) (LT)
( 1,299.95) (LT)
1965
714.43 (ST)
11,296.28
(48,955.23) (ST)
0.82 (LT)
( 1,299.13) (LT)
1966
6,347.64
(47,955.23) (ST)
1.12 (LT)
( 1,298.01) (LT)
b. Discharge of Indebtedness.
As explained above, the $7,500 deduction which petitioner claimed on his 1964 return resulted from petitioner paying $8,004.95 to Howard Fisher, as assignee of Usiskin, in settlement of a suit stemming from petitioner's failing to repay the money that was paid on behalf of petitioner and charged to his commodity account. Since the $8,004.95 paid to Howard Fisher was in essence the settlement of a claim arising from petitioner's failure to repay a *534 personal loan, it was a nondeductible expenditure in calendar year 1964, and is properly to be added back as an adjustment to his net worth in that year. The discharge in 1964 of petitioner's liability for $57,347.60, the amount which he owed to Usiskin/Fisher, reduced his liabilities at year's end by that amount, offset by a reduction of his assets in the amount of $8,004.95 which he paid. The net difference of $49,342.65, under the net worth method, constitutes an increase of net worth and additional income to petitioner, which is the same result as would be reached by recomputing petitioner's income on a specific-adjustments basis and treating the above amount of $49,342.65 as ordinary income from the discharge of indebtedness, which it clearly was, under section 61(a)(12). Republic Supply Company v. Commissioner,66 T.C. 446 (1976), affd. in unpublished opinion (10th Cir. 1978); Commercial Electrical Supply Co. v. Commissioner,8 B.T.A. 986 (1927). 8. Petitioner's Claimed Dependency Exemption Deductions for Kim and Christopher Vandersteen
On his 1964 tax return, petitioner claimed two dependency exemption deductions for Kim and Christopher *535 Vandersteen, his second wife's grandchildren, which respondent disallowed. Petitioner asserts that during 1964, he took care of these children and contributed more than one-half of their support during that calendar year. Petitioner's own testimony established that Kim and Christopher Vandersteen did not move into the Cleveland household until June or July of 1964. No evidence was placed into this record to establish the amount of support that petitioner provided for Kim and Christopher Vandersteen. Based on these facts, we cannot find that petitioner, over a five or six-month period, supplied over one-half of the support for Kim and Christopher Vandersteen for all of calendar year 1964, as required by section 152. Petitioner has failed to carry his burden of proof on this issue. B.Tax Year 1965.
Additional issues have been raised by petitioner with respect to respondent's net worth statement for the calendar year 1965. Of the many objections raised, three warrant comment. 1. Divorce Property Settlement.
Petitioner claims that some $13,554.99 should not be added to his net worth for calendar year 1965, as a nondeductible expenditure, on account of assets originating *536 with petitioner but taken or retained by Bernice when she separated from petitioner in 1965, since no decree of divorce was entered between petitioner and his second wife until July of 1966. Petitioner further alleges that no evidence was introduced by the respondent to establish the existence of any such divorce property settlement. As we have found, the "divorce property settlement" consisted of three items: a mink coat, a Pontiac car, and funds from a Glencoe National Bank account. When petitioner's second wife left him in 1965, she took with her the mink coat and the Pontiac automobile. Respondent thus deleted from his net worth schedule these assets as of December 31, 1965.
With regard to the Glencoe National Bank account, respondent relies on both petitioner's testimony and documentary evidence to establish that Bernice took $8,116.99 from that account on August 9, 1965. Respondent did not include the $8,116.99 from the Glencoe National Bank account in his net worth schedule since the account itself was opened and closed in calendar year 1965. Thus, these three assets, valued at $13,554.99, were excluded from respondent's net worth schedule for calendar year 1965.The *537 exclusion of these items reduced petitioner's net worth for that calendar year by $13,554.99. The record does not show, and indeed petitioner does not contend, that these assets were ever returned to him by Bernice. After calculating petitioner's net worth for calendar year 1965, respondent added back $13,554.99 to reflect the value of these deleted assets. Petitioner contends that this was improper. Respondent argues that regardless of whether these three assets were technically a divorce property settlement, a gift, or any other type of nontaxable distribution, these assets were no longer in petitioner's possession at the end of that calendar year, and it was proper for him to delete these items from his calculation of petitioner's net worth for that calendar year. Further, respondent argues that unless the value of these three assets is added back as a below-the-line adjustment, the deletion of the value of these assets would result in an unwarranted reduction in petitioner's income for that year -- in effect, a tax deduction. Under the net worth plus expenditures method, a taxpayer's income is computed by determining the excess of an individual's assets at cost, less his *538 liabilities at the beginning and ending of each tax year. Any increase in a taxpayer's net worth is then adjusted by adding all nondeductible expenditures, and subtracting all nontaxable sources of income.The three assets here in issue were taken by Bernice after she left petitioner. The fact that Bernice took these items should not, under the net worth plus expenditures method, have any impact on the calculation of petitioner's income during calendar year 1965.Since these assets were deleted by respondent in calculating petitioner's assets and liabilities, their value must be added back as if they were nondeductible expenditures, if we are to have an accurate picture of petitioner's income during this tax year. Respondent's "below-the-line" adjustment was therefore proper. 2. Expenditures Resulting From Charge Accounts Opened by Petitioner's Second Wife, Bernice.
Petitioner contends that expenditures listed on the net worth schedule for "Betty's of Winnetka," "Marshall Field & Co.," and "Pollyanna," should not be attributable to him as income. Petitioner reasons that Bernice had separate income resulting from a divorce property settlement from a prior husband, and from *539 the settlement of a claim that she had against an insurance company for personal injuries sustained in an auto accident. Petitioner claims that these funds could have been used to pay for items bought at "Betty's of Winnetka," "Marshall Field & Co.," and "Pollyanna." Respondent concedes that Bernice Cleveland may have had some separate funds resulting from the settlement of claims she had against an insurance company and a former husband. However, respondent has already reduced petitioner's income to reflect these separate funds. At trial, respondent introduced into evidence a schedule of nontaxable income items. Petitioner testified at trial that this schedule was basically correct. The schedule of nontaxable income items includes the separate funds that petitioner claims could have been used to pay for items purchased by Bernice at the above-mentioned retail stores. Petitioner does not contend that his wife had additional sources of income. Respondent was therefore correct in adding back these items as nondeductible personal expenditures. 4. Loans Made by Petitioner to Clients.
Petitioner claims that additional nontaxable sources of income, resulting from loan repayments *540 made by clients to petitioner, were omitted from respondent's net worth schedule for calendar years 1965 and 1966. On his returns for those years, petitioner claimed deductions of $1,752.33 and $2,357.32 for "costs advanced." Petitioner's return preparer, Phillip Caloger, stated to Special Agent Carey that these claimed deductions were the net figures arrived at by subtracting recovered costs and loans from the costs and loans advanced. In other words, petitioner's claimed deductions were calculated by taking the loans and costs that petitioner advanced to clients during 1965 and subtracting loans and costs that he recovered from clients for advances made in prior years. It is clear from petitioner's own evidence that if petitioner received loan repayments during 1965 and 1966, these repayments were exceeded by additional client loans or expenditures made during this same period. Respondent has not added back any additional loans made for calendar years 1965 and 1966 in his net worth schedule as nondeductible expenditures. Therefore, any increase of nontaxable income resulting from loans repaid to petitioner in 1965 and 1966 would be more than offset by additional expenditures *541 which were allowed (as reductions in net worth) in respondent's net worth schedule. Respondent's action is approved. C. Tax Year 1966.
For calendar year 1966, only two of the many arguments offered by the petitioner present legal issues that need to be addressed. These issues follow: 1. Alleged Additional Nontaxable Income for 1966.
Petitioner contends that he received additional nontaxable income of $3,000 in 1966, not allowed by respondent. The basis of petitioner's claim rests upon the alleged fact that he received $3,000 as a prepayment for the cost of an appeal in a case which he was handling for a client. Petitioner contends that this money was a nontaxable source of income since it was a prepayment for printing costs that were to be incurred in filing the appeal. At petitioner's second criminal trial, a witness testified that petitioner engaged the services of Midwest Law Printing Company on approximately March 24, 1967.The record establishes that petitioner paid approximately $2,500 for printing costs at Midwest Law Printing Company between April, 1967, and December, 1969. [18] We do not feel, however, that petitioner has established that the $3,000 *542 given to him by his client's brother in 1966 was actually used to pay these printing costs. Further, there is no explanation in the record why petitioner paid these printing costs in small amounts over a two and a half year period if he had already put aside $3,000 in cash to pay for this printing. We hold that petitioner has failed to carry his burden of proof of establishing that this $3,000 was in fact a nontaxable source of income. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). 2. The Gazzola Loan.
Petitioner contends that he owed Mrs. Electra Gazzola $2,425 at the end of calendar year 1966. Mrs. Gazzola testified at petitioner's two criminal trials, and stated that she lent petitioner $1,650 in July 26, 1966, and an additional $775 on November 10, 1966. The sum of these two loans totals the $2,425 that petitioner now asserts should be included in respondent's net worth schedule as a liability. Respondent's net worth schedule does not include this alleged liability because, in the Government's *543 opinion, these two payments were compensation for services. Respondent alleges that Mrs. Gazzola had known petitioner socially for 18 years, and had engaged petitioner to represent her son in criminal state court proceedings.Respondent rests his assertion on the fact that on the bottom left hand margin of one of Mrs. Gazzola's checks, there is a notation which stated "paid in full." Respondent thus claims that the money given to petitioner by Mrs. Gazzola was in payment for services rendered with respect to these criminal proceedings. We do not believe that the respondent has produced sufficient evidence for us to infer that Mrs. Gazzola committed perjury at petitioner's earlier criminal trials. Respondent's reliance on the "paid in full" notation on one of Mrs. Gazzola's checks is inconclusive. We think that petitioner has satisfactorily shown that this was loan money, and have adjusted our recomputation of net worth accordingly. As a consequence of our findings and holdings herein, it results that petitioner had unreported income for the years 1964 and 1965 in excess of the amounts determined by respondent. In the necessary recomputation of tax and additions to tax which *544 will be necessary herein under Rule 155 to give effect to the results which we have reached, however, we note that respondent did not amend his pleadings at or before trial herein so as to claim any additional deficiencies or additions to tax, over the amounts contained in his statutory notices. Our decision for each year may not exceed the amounts as originally determined by respondent. Section 6214(a); Pittman v. Commissioner,24 B.T.A. 244 (1931); Watson v. Commissioner,T.C. Memo. 1972-36. Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the tax years here in issue, except as otherwise noted; and all Rule references are to the Rules of Practice and Procedure of this Court. ↩
2. Including self-employment tax, as to which respondent made no adjustments to the amounts reported by petitioner in his returns.↩
3. In his petitions herein, petitioner alleged an overpayment of tax for the years 1961 and 1965. Nothing further was offered on these matters, however, either at trial or on brief, and such claims are deemed to be abandoned. ↩
4. Although petitioner did not raise this issue in his pleadings, the parties tried and briefed the case as though it were properly before us, and we will therefore consider it, under Rule 41(b).↩
5. See discussion in opinion, infra,↩ p. 43 et seq.
6. See discussion in opinion, infra,↩ p. 54.
7. Section 6501(c)(1) provides: False Return. - In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. Section 6653(b) provides: Fraud. - If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment * * *.↩
8. Thus, for example, an increase in assets, a reduction of liabilities or a nondeductible expenditure is an adjustment against petitioner's interest, whereas deductions for nontaxable income, capital gains, gifts and personal exemptions is an adjustment against respondent's interest.↩
9. Stone v. Commissioner,56 T.C. 213, 224↩ (1971).
10. Petitioner also insinuates that respondent has not included in his net worth schedule a long-term capital loss resulting from the sale of Colorado Fuel and Iron stock in calendar year 1964. Contrary to this assertion, documentary evidence submitted at trial shows that respondent did not overlook this item.↩
11. Petitioner filed a joint return with his wife Bernice in 1964. Respondent's net worth, and our findings with respect thereto, are calculated with respect to petitioner's items only. Any separate assets Bernice may have had are accounted for as nontaxable sources of income. For 1965 and 1966, petitioner filed a separate return.↩
12. Respondent's action in adding back the entire premium as a nondeductible expenditure has the effect of treating the alleged "commission" portion as taxable income, which it would be. Commissioner v. Minzer,279 F.2d 338 (5th Cir. 1960), revg. 31 T.C. 1130 (1959). See Bailey v. Commissioner,41 T.C. 663↩ (1964).
13. The difference between petitioner's obligation of $57,347.60, as shown by Usiskin's books, and the $57,315. for which suit was instituted is not explained in this record.↩
14. See Adda v. Commissioner,10 T.C. 273, affd. 171 F.2d 457 (4th Cir. 1948), cert. denied 336 U.S. 952; Commissioner v. Wiesler,161 F.2d 997↩ (6th Cir. 1947).
15. In 1961, the holding period for short-term capital losses was six months. Section 1222(2).↩
16. Respondent has now conceded that there are no deficiencies due from petitioner for 1961.↩
17. Cf. Rev. Rul. 76-177, 1976-1 C.B. 224. * Before capital gains or losses and before deductions for personal exemptions, per section 1211.↩
18. The evidence referred to herein from petitioner's former criminal trial was received in evidence in this case by stipulation of the parties.↩